# IN THE COURT OF APPEALS OF IOWA

No. 20-1658
Filed September 1, 2021

IN RE THE MARRIAGE OF CANDACE EUGENA MOSLEY
AND JEROME TERRELL MOSLEY, JR.

Upon the Petition of
**CANDACE EUGENA MOSLEY,**
        Petitioner-Appellee,

And Concerning
**JEROME TERRELL MOSLEY, JR.,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Story County, James C. Ellefson,

Judge.


        Jerome Mosley Jr. appeals the denial of his petition to modify custody and

care of his child with Candace Brutus.  **REVERSED AND REMANDED.**


        Daniel M. Northfield, Urbandale, for appellant.

        Candace Brutus, Ames, self-represented appellee.


        Considered by Bower, C.J., Greer, J., and Vogel, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2021).

**VOGEL, Senior Judge.**

Jerome Mosley Jr. appeals the denial of his petition to modify custody and care of his child with Candace Brutus, formerly known as Candace Mosley.[1] The parties married in 2005 and had one child together, T.M., born in 2006. On January 23, 2014, an order was entered dissolving the parties' marriage. The order granted the parties joint legal custody of the child and placed physical care of the child with Candace with Jerome having visitation at least every other weekend plus two weeks during summer and shared holidays.

On August 24, 2015, Jerome filed his first petition for modification, asserting Candace had been recently charged with multiple felonies after confronting a family member and this incident constituted a substantial change in circumstances justifying modification. On November 12, Candace pled guilty to reckless use of a firearm, in violation of Iowa Code section 724.3(2) (2015), a class D felony. The court deferred judgment and placed her on probation for two years. On May 26, 2016, the district court denied Jerome's petition to modify custody, finding no substantial change in circumstances:

> Clearly, the parties did not contemplate Candace would be charged with attempted murder and willful injury or ultimately plead guilty and receive a deferred judgment for reckless use of a firearm. Jerome was certainly justified in his concerns when this incident came to light. Nonetheless, the record does not reflect that [the child] was present for this incident or that the incident caused him physical or emotional harm. While Jerome testified that [the child] suffered some abandonment issues when Candace was arrested, she was soon thereafter released and resumed primary care of [the child]. Nothing in this record connects any of the problems [the child] was encountering in school to either Candace's criminal charges or her [subsequent remarriage]. The record is not well developed

---

[1] Candace has a younger child with a different father. No ruling on this younger child is part of this appeal.

concerning when these problems began for [the child] or what the cause or source of these problems were.

In October 2019 Candace posted a social media message to her father that threatened harm to herself and the child:[2]

I hope you remember how good you feel right now thinking you got one over on me when they find me and your grandsons dead. You of all people know what I do when reach that breaking point. And being such a great father, instead of comforting and loving your daughter off that ledge you get to live with fact YOU PUSHED her over. Dirt bag! Over a car seat and some TV remotes. You are such A piece of shit!

Her father notified the police, who then located a loaded nine-millimeter semi-automated handgun in the glovebox of Candace's van. She was transported and evaluated at the local emergency room. The incident also led to involvement from the Iowa Department of Human Services (DHS) with removal of the child from Candace and placement with Jerome.[3] It also provided the facts upon which Jerome filed his second petition for modification on March 5, 2020. The district court denied Jerome's petition on November 16, finding no substantial change in circumstances. The court reasoned Jerome's concerns were either addressed in the first modification action or were being resolved through the mother's engagement with DHS and therapy. Jerome appeals.

We review a ruling on a modification petition de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We give weight to the district court's

---

[2] This message also threatened harm to Candace's younger child. The younger child was removed from Candace's care but later returned to her.

[3] The district court assumed concurrent jurisdiction with the juvenile court proceeding. The parties stipulated to a child-in-need-of-assistance (CINA) adjudication in juvenile court. At the time of trial here, the most recent juvenile order was a May 2020 permanency order that continued the CINA adjudication and placement of the child with Jerome.

findings of fact, especially regarding witness credibility, but we are not bound by them. *Id.* Our controlling consideration is the best interests of the child. *Id.*

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the [child's] best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the [child]. A parent seeking to take custody from the other must prove an ability to minister more effectively to the [child's] well being.

*Id.* (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)).

On appeal, Jerome points to Candace's troubling October 2019 social media message threatening to take the life of herself and T.M. with the ensuing removal by DHS as a substantial change in circumstances. He further asserts Candace's actions have permanently damaged her relationship with the child, as the child now expresses a clear preference to live with him.

In finding no substantial change in circumstances, the district court stated:

> This court formed its own impression of [Candace] from a review of the full record, including her testimony at trial. . . . This court does not overlook or minimize the serious, indeed frightening, nature of her October 2019 social media message . . . . [Candace] is taking effective steps to address the issues that message exposed; this court finds fully credible her expressed commitment to continue with the care needed for her own mental and emotional health.

On our de novo review, and giving weight to the district court's findings, we nonetheless find there was a substantial change of circumstance that is more or less permanent, that Jerome has proven to be able to minister more effectively, and it is in T.M.'s best interest to reverse the district court's order.

There is no dispute that Candace had a gun and posted an extremely frightening social media threat to kill herself and her children. More than one year later, during the modification hearing, Candace admitted she has struggled with her own personal and mental-health issues. Furthermore, she acknowledged the child does not want to live with her. She explained that she suffers from complex PTSD and severe depressive disorder. To her credit, Candace has participated in therapy to help rectify her behavior. However, she minimized the severity of her suicidal and homicidal threats by testifying, "I felt that the issues that warranted the removal [of T.M.] had been misinterpreted and really taken out of context." She claimed that she agreed to stipulate to the child as being in need of assistance in the juvenile court proceeding, but she testified in this modification proceeding that it was "not due to any abuse or neglect." She claimed that things in her personal life had "boiled over" and she "wasn't able to—did not react in that very inappropriate way." After more than one year of DHS involvement, Candace and the child remain in need of therapy and their relationship may never recover. Considering all the evidence, we find Jerome carried his burden to show a material and substantial change of circumstances.

The answer as to whether Jerome is—at this point—able to minister more effectively to T.M. lies in part to the fact that he stepped up to be a full-time parent to T.M. when Candace was unable to do so. The district court, relying on a DHS report, found Jerome "is entirely unwilling to support any relationship between" Candace and the child. Considering the seriousness of Candace's actions and the child's ongoing animosity toward her, Jerome has been understandably hesitant at times to support the relationship between Candace and the child. Nevertheless,

Jerome testified that he encourages T.M. to attend family therapy with Candace and have a good relationship with her. In addition, T.M's therapist wrote in an October 20 report that Jerome, "verbalizes a desire for [Candace and T.M.] to strengthen their relationship when T.M. is ready." With T.M. in a stable placement with Jerome, and Jerome now encouraging a better relationship between T.M. and Candace, we find Jerome has proved to be able to minister more effectively to T.M. as demonstrated during this difficult time for the family.

Therefore, with the best interests of T.M. as our polestar, we reverse the order of the district court, find a substantial change of circumstances, and that Jerome can better provide for T.M.'s wellbeing. We remand for the district court to address the attendant factors of visitation and child support.

**REVERSED AND REMANDED.**

Bower, C.J., concurs; Greer, J., concurs specially.

**GREER, Judge** (specially concurring)

I concur in the majority opinion but emphasize additional supporting points that lead me to that result. First, contrary to Candace's characterization that she was just angry and made the social media post to "hurt" her father, the reaction of her family to her irresponsible behavior sheds light on her stability. Rather than dismissing her words as just an angry post, her father, with whom she had been living, acted on the seriousness of Candace's threat to harm T.M. Then, the family reported to DHS that Candace had been "exhibiting increasing agitation and impulsive behavior" even before the post. Coupled with these reactions, as T.M. heard the details of Candace's threat in the temporary removal hearing, the child became "pale, flushed and . . . put his head down on the table." Again, the reactions of the grandfather and the child speak louder than words about the reality of Candace's stability. Still, Candace believed that the child's fear of her "was more based on the October incident" involving her shooting of the uncle. I can surmise that is true, but the emotional harm of these incidents of gun violence have taken their toll. The child told the DHS investigator that Candace explained to him she shot the uncle because "he wasn't listening" and "he was dismissive." The child also offered "[the mother] says I never listen to her." We do not disagree but speculate that in the child's mind, coupled with Candace's actions against the uncle, the threat was all too real. And, the juvenile court confirmed the child was "highly traumatized" by the threat. This history of impulsivity with the use or threat of use of a weapon weighs heavily against Candace. *See In re Hall*, No. 03-1618, 2002 WL 894598, at *3 (Iowa Ct. App. April 28, 2004) (finding a parent's unreliable

and unstable lifestyle operated as a detriment to the child and justified a change in custody).

Finally, the wishes of a teenager, described by all as intelligent, carries weight especially when understood through the eyes of his long-standing therapist.[4]  *See In re Marriage of Hoffman*, 867 N.W.2d 26, 35 (Iowa 2015) (holding teenage child's preference is significant, but entitled to less weight in a modification).  T.M.'s therapist confirmed the child's preference to remain in Jerome's care, the child's anger at and fear of the mother, and the long road of therapeutic work required, but not yet accomplished, to repair the relationship.[5]

---

[4] In May 2020, the juvenile court opined that the child was "possessed of age-appropriate intellect and has appropriate supports [his cooperation with therapy] to reach a conclusion consistent with his best interest to remain placed with his father."

[5] The child's counselor reported:

> [The child] continues to verbalize that he wants to live with his dad with visitation to his mother.  He wishes for his mother to respect his boundaries of communication, as well as for her to continue her own therapy.  He feels he cannot trust her reactions, which cause him confusion and false guilt.  He would also like to feel as though he is important and "a part" when he visits mom.  He is happy at dad's house because he is less isolated with support.

> [The child] was ready for mom to join him in sessions to work on strengthening the relationship, but changed his mind when he felt that mom was not respecting the boundaries of "talking about things she's not supposed to."   [The child] loves both of his parents very much, but he demonstrates continued desire to manage his mother's emotions.  He identified several occasions where his mom has personalized his innocent interactions with friends and has "yelled at" him or punished him.

> Finally, [the child] has verbalized confusion, hurt, and frustration over his mother's insistence that he turn over a Christmas gift that she gave him in the past.  He verbalized feeling as though the game system is more important to his mom than he is.

> [The child] is observing mom's interactions with him and has reported that when he feels he can trust her he will be open to her meeting with him in session.

The child's concerns seem very insightful for a teenager and are supported by his therapist. T.M. and his therapist had a one-year relationship of treatment even before this October 2019 event. The therapist documented that after the threat, the child believed his "mom was really going to kill me," leading to an increase in anxiety, more difficulty in school, and trouble with concentration. Although Candace recognized the long-standing and close relationship between T.M. and his therapist, she put up barriers to sessions for reunification involving that counselor and blamed T.M. for being "unwilling to contribute on his end." At the time of trial, T.M. had lived with Jerome for over a year with little progress in repairing the relationship between Candace and T.M. Even she acknowledged she would not force him to return to her care "until he felt safe." Considering all these facts, I agree that Jerome carried his burden to show a material and substantial change of circumstances.

As for the question if Jerome can minister more effectively to T.M., we can look to history again. Although the district court, relying on a DHS report, found Jerome "is entirely unwilling to support any relationship between" Candace and the child, it prefaced this conclusion by noting "[t]he question then becomes, is [Jerome's] attitude the product of genuine fear that [Candace] would cause harm to T.M., or does it come from something else?" The district court found Jerome had a "long-standing animosity" toward Candace. But the record does not support that finding, and I agree with the majority that Jerome's hesitancy to support the relationship of Candace with the child is understandable given the emotional trauma wrought on T.M. Shortly before the social media threat, in the spring of 2019, Jerome and Candace arranged for a different care plan for T.M. Jerome

testified "because I guess something was going on in [Candace's] house, but I did have him a lot more and that was per our agreement with his mother, where he was staying with me and then I was basically walking him to the bus every morning."  Thus, not only did Jerome and Candace co-parent previously, Jerome offered care during the week to support Candace.  All of this supports Jerome's ability to provide superior care to T.M.

Under the record developed at trial, I concur with the award of custody to Jerome in this modification action.